# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **::** | |
| | **::** | **CRIMINAL ACTION FILE** |
| **v.** | **::** | |
| | **::** | **NO. 1:15-CR-0194-WSD/AJB** |
| **JASPER MCINTOSH** | **::** | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Defendant Jasper McIntosh is charged in a single-count indictment with distributing heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2. [Doc. 1]. He filed a motion to suppress out-of-court identification, [Doc. 24], and then supplemented the motion, [Doc. 27].[1] The Court held evidentiary hearings on the motion, [Docs. 34 (hereinafter "T1:__"), 36 (hereinafter "T2:__")], after which the parties filed post-hearing briefs, [Docs. 37 (McIntosh), 38 (McIntosh amendment), 39 (Government), 40 (McIntosh)]. With briefing concluded, the Court **RECOMMENDS** that the motion, [Doc. 24], be **DENIED**.

### *Facts*

Georgia Bureau of Investigation ("GBI") Special Agent Kelly Aldrich is part of the GBI's West Metro Regional Drug Enforcement Office. T1:3, 4. As of the time of

---

[1]     The Government responded to the supplemental motion. [Doc. 28].

the evidentiary hearing, she had been a GBI agent for almost ten years, working only narcotics cases, and had participated in approximately forty undercover operations. T1:4, 5.  In February 2015, she became involved in an undercover operation referred to as the "Drug Marketing Initiative" ("DMI") in the English Avenue area of Atlanta, where agents attempted to make as many heroin buys from as many people as they could and then decided which sellers would be prosecuted and which ones would be referred for drug or other treatment.  T1:6.[2]

In this operation, Aldrich and her partner, Task Force Agent Andresen, were dressed in plain clothes, drove through the neighborhood with their undercover vehicle's windows down, and would be flagged down by persons offering to sell them heroin.  T1:7, 39.  During the course of the DMI investigation, Aldrich participated in twenty such transactions, and she and Andresen tried to make two purchases per day. T1:7.  Each transaction was audio- and video-recorded.  T1:8; *see* Govt. Ex. 1.  The cameras were located on the inside of their unmarked vehicle on both of the front-seat doors.  T1:39.

---

[2]      Aldrich testified that the agents did not immediately arrest those persons from whom they bought narcotics so as to not compromise the ongoing investigation. T1:15-16.

2

Aldrich testified that in conducting undercover narcotics buys, she first focuses primarily on the hands of the person from whom she is buying drugs, because any infliction of physical harm is likely to come from that person's hands. T1:8. However, since the agents' goal was to identify the persons from whom they purchased narcotics on the same day that the purchases were made, Aldrich also paid attention to the person's clothing, size, stature, hair, and facial features, keeping mind that she might have to identify the person on some later date in court. T1:8-9. In order to try and identify a person shortly after each heroin buy, the undercover agents relayed over the radio a description of the seller and that person's clothing, so that uniformed Atlanta Police Department ("APD") officers listening to the transmission could enter the area, attempt to locate the seller, and then obtain the seller's identification information. T1:8-9; T2:6, 7-8. The plan was to have APD officers go into the neighborhood in between Aldrich and Andresen's two purchases, and this protocol resulted in obtaining identification information fifty to sixty percent of the time. T1:24-25. After receipt of identifying information of the suspected seller obtained by the uniformed officers, Aldrich and Andresen then would look at the identified person's driver's license or book-in photograph to see if that was the same person from whom they had earlier purchased drugs. T1:25-26. If the person could not be identified, the agents would

3

then try to buy again from that person.  T1:26.  Aldrich distinguished this type of operation from the more typical drug investigation, where a law enforcement agent generally knows the identity of the person from whom the agent is purchasing drugs, whereas in this case, the person's identity generally was unknown.  T1:10.

In this case, on March 27, 2015, at approximately 11:00 a.m., Aldrich and Andresen attempted to buy narcotics in the English Avenue neighborhood.  Andresen was driving, and Aldrich was the passenger.  The encounter was audio- and video-recorded, and at least two sets of two uniformed APD officers and APD Lt. Ricker were able to monitor the audio transmission from their positions in parking lots close to but out of view of the attempted drug buys.  T1:11; T2:12; Govt. Ex. 1.  In the area of the intersection of Cameron Alexander Blvd. and James P. Brawley Drive, Aldrich and Andresen were flagged down by a black male.  T1:11, 12; Govt. Ex. 1 at 11:12:00.  The male approached the passenger side of the undercover vehicle and asked, "Hey, what's up?"  Aldrich asked for fifty dollars' worth of "boy," a slang word for heroin.  T1:13.  The male told them to drive around the

block and then return.  *Id.*  The male was standing on the sidewalk about three feet from the passenger window.[3]  *Id.*  The male was wearing a hoodie and sunglasses.  T1:14.

Aldrich and Andresen circled the block, and while driving, they radioed the following description of the person with whom they just spoken to the other law-enforcement officer monitoring the transmission:  black male, blue-hooded sweatshirt, black T-shirt underneath, sunglasses, goatee, crooked teeth, and dark-colored jeans, and they stated that the person was headed north on James P. Brawley.  T1:15-16, 17, 18, 39, 42; T2:14, 23; Govt. Ex. 1 at 11:13:08-35. When Aldrich and Andresen returned to the intersection after driving around the block as instructed, they recognized the male walking towards them as the same person with whom they had interacted moments before.  T1:16-17; Govt. Ex. 1 at 11:14:21. Andresen then announced that the male had pants rolled up at the bottom, Govt. Ex. 1 at 11:14:30, and black boots, *id.* at 11:14:36.[4]

The hoodied male approached the passenger window of the agents' vehicle, reached in, and handed Aldrich a plastic bag containing suspected heroin, and she in

---

[3]      The male's face is not visible on the video during Aldrich and Andresen's first encounter with him.  *See* Govt. Ex. 1, *passim.*

[4]      In her post-transaction report, before looking at any photographs, Aldrich included only the male's height and weight and approximate age.  T1:17.

turn paid him $50.  T1:18.  Aldrich testified that she had a clear, unobstructed view of the male at this time, that she was less than a foot away from the male during the transaction, and that they were so close that their hands touched during the exchange. T1:18-19.  The suspect's face is briefly seen in the video.  Govt. Ex. 1 at 11:14:37-39. Aldrich further testified that although initially she was focused on the seller's hands, once she handed him the money, she was looking at his face because she knew that she was going to have to identify him.  T1:19.  She asked for his phone number on the chance that it would assist her in identifying him or ordering more narcotics in the event that he could not subsequently be identified.  T1:19-20; Govt. Ex. 1 at 11:14:44. He gave her a phone number, and she wrote the number on her hand.  T1:20; Govt. Ex. 1 at 11:14:47.  The seller identified himself as "Moses."  Govt. Ex. 1 at 11:14:50.  As they drove away, Andresen announced for the recording that the seller had a big ring on his right ring finger.  Govt. Ex. 1 at 11:15:01-05.  Aldrich identified McIntosh in the courtroom as the seller despite differences in his appearance (he now is in a wheelchair, and he was not wearing sunglasses or a hoodie when in court); she testified that she recognized him due to the shape of his face, his goatee, and his nose and mouth.  T1:21-22.

6

Ten to fifteen minutes after the purchase of heroin from the hoodied male, Aldrich and Andresen made a heroin purchase from another person.  T1:22.  Aldrich never saw the person from the second transaction again.  T1:23.

After the second transaction, Aldrich and Andresen went to the staging area where they met with and were debriefed by Lt. Ricker.  T1:24.  Aldrich did not meet with the uniformed officers who had then entered the neighborhood in an effort to locate the hoodied male from the first transaction.  T1:42.

APD Officers Hemphill and Gibson comprised one group of officers whose task was to go into the neighborhood after the transaction and attempt to locate the seller based on the undercover agents' radioed description, as well as the description Lt. Ricker broadcasted to his patrol officers in the event these officers did not hear the undercover agents' radio transmissions.  T1:48; T2:10, 22; *see also* T2:23 (Lt. Ricker radioed that the transaction occurred at James P. Brawley and Carmen Alexander, and that the suspect was a black male with a goatee wearing a blue hooded sweatshirt, a black T-shirt, dark blue jeans rolled up, black boots, and a big ring on his right hand).[5]

---

[5]     Lt. Ricker took contemporaneous notes of the initial and follow-up observations of the undercover agents, as well as from the recollections of other officers listening in on the transmissions.  T2:23-24; Def. Ex. 2.  The notes reflect the different details transmitted by the undercover agents.  For example, the entry on his notes "rolled up," off to the right of the description "Dark blue Jeans," appears in a lighter

The patrol officers did not see the video being recorded in real time, but they were able to overhear the radio transmissions from the undercover agents.  T1:48, 50; T2:5-6.  Almost immediately after the drug purchase and upon receiving a signal, Hemphill and Gibson drove to the intersection to look for the suspect.  T1:49, 59.  They had been stationed at a church parking lot on North Avenue at Lindsay Street, about two blocks from the intersection of Cameron Alexander and James P. Brawley.  T1:50, 58.  They went looking at that intersection for a black male with a goatee, sunglasses, a navy sweatshirt, dark jeans, and black boots.  T1:50-51.

Upon arriving at the intersection, Hemphill saw a person matching that description standing in the street at the stop sign.  T1:51, 60.  There were other persons in the vicinity, but none matched the description that he had received via radio, and the person was the only individual located right at the corner.   T1:60.   Hemphill approached him and was told by the person that he was waiting on a ride.  T1:51.  Hemphill did not see any vehicles, and Hemphill asked and obtained the person's name and date of birth: Jasper McIntosh, born August 12, 1985.  T1:51-52; T2:10; Def. Ex. 2.

_____

shade of ink, consistent with the fact that the "rolled up" description was not transmitted by Andresen until the agents returned to the intersection after circling the block, Govt. Ex. 1 at 11:14:30, following the undercover agents' earlier remarks that the suspect was wearing dark blue jeans.  *See* Def. Ex. 2; Govt. Ex. 1 at 11:13:08-35.

McIntosh asked Hemphill why he wanted his information.  T1:51.  Hemphill replied because he was standing in the street.  T1:51.  Hemphill reviewed McIntosh's identification, ran his name and date of birth for warrants, which inquiry came back negative, and returned the identification to McIntosh.  T1:51-52.  Hemphill thanked him for his cooperation, and McIntosh departed in the ride he stated he was waiting on. T1:52.

Hemphill referred McIntosh's name, date of birth, and address to Lt. Ricker. T1:52; T2:10.  Lt. Ricker wrote down the information and relayed McIntosh's name and date of birth to Aldrich and Andresen when he met with them following their second heroin buy that morning.  T1:26; T2:10-11; Def. Ex. 2.  At the time that he conveyed this information to them, Lt. Ricker had not viewed the video of the transaction recorded by Aldrich and Andresen during the first sale.  T2:12.

After Aldrich and Andresen completed their two heroin buys for the day, other law-enforcement agents entered the English Avenue area and attempted to make other drug purchases.  T1:24.  After those purchases, these agents, along with Aldrich and Andresen, engaged in a debriefing, and after lunch, Aldrich and Andresen went to APD headquarters.  T1:24.  Aldrich and Andresen did not review the video of their encounter with the hoodied male or show the video to the APD patrol officers who had searched

9

for the seller.  T1:24-25, 37.  Instead, at around 3:00 p.m., they searched an APD database for McIntosh based on his name and date of birth, and, upon viewing a book-in photo of Defendant, Aldrich recognized Defendant as the person from whom she earlier had purchased heroin.  T1:37, 43; *see also* Govt. Ex. 2.[6]  The identification was made a few hours after the transaction at James P. Brawley and Cameron Alexander.  T1:37.  Aldrich was "very positive" that the person she bought heroin from was depicted in the book-in photo.  T1:37.  On March 30, 2015, Aldrich later obtained from a GBI analyst a copy of McIntosh's driver's-license photograph.  T45; Def. Ex. 1.

### Contentions of the Parties

McIntosh contends that his due-process rights were violated because the use of a single-photograph identification procedure was unnecessarily suggestive and the undue suggestiveness was compounded by the use of a book-in photo that did not match the description given by Aldrich during her encounter with McIntosh.  [Doc. 38 at 10].  He further contends that the fact that a book-in photo was

---

[6]     Govt. Ex. 2 is a photograph—taken at a later, unknown date—of a screen shot from Andresen's computer that was identified as the image viewed by Aldrich on March 27, 2015.  T1:32-34.  In order to print the image displayed on the computer screen, Andresen had to import the image into a wanted flier.  T1:35-36; Govt. Ex. 3.  Aldrich made the identification of McIntosh before Andresen compiled and printed the wanted flier, which flier contained "filler language" such as "Heroin Dealer" and random letters.  T1:36-37.

AO 72A
(Rev.8/8
2)

used is unduly suggestive because the record shows that law enforcement had several photographs of him to use to make an identification.  [*Id.* at 12].  He also argues that it is in fact not clear which photograph was reviewed by Aldrich in making the identification, since the book-in photo was not attached to her report and the information referenced in that report is the type of information contained in a driver's license photo and not a book-in photo.  [*Id.* at 11].

McIntosh further argues that Hemphill's identification was also unduly suggestive because over ninety-nine percent of the English Avenue residents are African American, and the description given by Aldrich and Andresen was generic—black male, goatee, gold chain,[7] blue hoodie sweatshirt, dark jeans, and sunglasses—and is neither unusual or striking.  [*Id.* at 12].  He also argues that Hemphill could have, but did not, take a photograph of the individual he saw to show that he matched the description given to him by the undercover agents and Lt. Ricker, nor did he make a written report about his interaction with McIntosh.  [*Id.* at 12-13].

---

[7]    The Court is unsure of the source of McIntosh's argument that the description of him included a gold chain.  The Court concludes that when Andresen was detailing the seller's description for the recording, although the recording is somewhat garbled or muffled at this point, it sounds like Andresen was reporting that the seller had crooked teeth.

11

Next, McIntosh argues that Aldrich's identification is not reliable because (1) she did not have a good opportunity to view the suspect, since she was seated in her vehicle; (2) she focused initially on the suspect's hands, but even if trained to study his face, she made no report about her observations; (3) although she described the suspect's height, weight, age, skin tone, clothing, and crooked teeth, she did not report on his nose or lips; (4) she had a very limited period of time to view the suspect; and (5) the photographic showup was not on the scene or immediately after the incident.  [*Id.* at 13-14 (citing *Johnson v. Dugger*, 817 F.2d 726 (11th Cir. 1987))].

McIntosh also argues that the identification was unreliable because neither the photograph Aldrich claims to have used to identify McIntosh nor the driver's-license photograph match the description given by the undercover agents during the encounters with him.  He points out that the agents reported that the seller had a goatee but that the photographs show McIntosh with a full beard.  [*Id.* at 14].  Further, since McIntosh is not smiling in either photograph, there is no indication that he has crooked teeth.  [*Id.*]. Finally, he submits that the balance of the agents' description was clothing-related, and his clothing is not reflected in either of the two photographs arguably used to make the identification.  [*Id.* at 14-15].  He therefore seeks suppression of the identification.  [*Id.* at 15].

In response, the Government concedes that the issue of suggestiveness is close because Aldrich viewed a single photo, but it contends that the courts have eschewed categorical rules in determining overly suggestive identification procedures. [Doc. 39 at 13 (citation omitted)]. The Government argues that the Supreme Court was primarily concerned with improper police arrangement of the circumstances surrounding an identification, with a focus on improper showups, lineups, and photo arrays, and not with excluding eyewitness testimony generally in the absence of police misconduct. [*Id.* (citing *Perry v. New Hampshire*, 132 S. Ct. 716, 726 (2012))]. It then argues that, while showing an eyewitness a single-photo showup may be inherently suggestive, Eleventh Circuit cases provide that undue suggestiveness arises in such situations only where the police aggravate the suggestiveness of the confrontation. [*Id.* (citing *Johnson*, 817 F.2d at 729)]. The Government contends that cases discussing single-image showups actually deal with single-individual, and not single-photo, showups. [*Id.* at 13-14 (citations omitted)]. It submits therefore that the Court should treat the fact pattern in this case as similar to a photo array, as opposed to a single-photograph showup, and determine whether, under traditional suggestiveness factors and the totality of the circumstances, Aldrich's review of a single photograph bears the " 'taint of improper state conduct' " so as to warrant

13

" 'screen[ing] such evidence for reliability before allowing the jury to assess its creditworthiness.' " [*Id.* at 14 (quoting *Perry*, 132 S. Ct. at 728)].  It contends that no such improper signal or pressure to identify existed here because (1) the officers presenting McIntosh's name had not seen the transaction; (2) " 'due to the nature of the environment, it was improbable that the officers would identify the right suspect,' " [*id.* at 14]; (3) there were alternative means to identify the suspect after March 27; and (4) an identified suspect might not even be charged with heroin distribution. [*Id.* at 14-16].

Discussing the individual suggestiveness factors, the Government first contends that the process was not suggestive, despite the fact that a single-photo showup has been found suggestive.  It argues that many of the cases in which courts found single-photo showup identifications to be unduly suggestive involve untrained civilian identifications made under emergency or emotional circumstances, as opposed to here, where a suspect was identified in an undercover investigation by a officer trained in identifications. [*Id.* at 15-16 (citing, *inter alia*, *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977))].

The Government next contends that the manner of presentation of McIntosh's book-in photo was not suggestive because Aldrich was not pressured to select him, nor

14

was there a suggestion that McIntosh was the culprit, since Hemphill merely identified someone who was standing at the corner wearing clothing that matched the undercover agents' description.  [*Id.* at 17].  It also points out that Hemphill did not select the photograph to be displayed to Aldrich, nor was he present when she viewed the photograph, and thus the identification occurred in circumstances " 'allowing care and reflection.' "  [*Id.* at 17-18 (quoting *Brathwaite*, 432 U.S. at 116)].

The Government also argues that the officers all acknowledged that it was difficult to identify persons in the English Avenue area selling drugs, given that there were multiple persons selling heroin in the neighborhood, multiple people could match the description given by the agents, and law enforcement only had a fifty-to-sixty-percent chance of identifying someone.  Thus, it urges the Court to analogize the factual scenario in this case to the admonition given to lay eyewitnesses that a photo array may or may not include a photograph of the person who committed the crime.  [*Id.* at 18 (citations omitted)].

The Government next contends that there was no rush to identify the seller because it was a long-term investigation, Aldrich had the seller's cellphone number to set up additional transactions, APD officers would continue to search this neighborhood for someone matching the description if Aldrich was unable to identify

15

the seller, Aldrich had not reviewed the video of the transaction yet to see if it captured a clear image of the seller's face, and Aldrich had no reason to believe that the seller would escape justice if she did not identify the person Hemphill presented.  [*Id.* at 19]. It also contends that suggestiveness was limited because not all persons who sold heroin in this investigation were necessarily going to be prosecuted.  [*Id.*].

The Government then argues that the details of the photograph were not suggestive, submitting that although it was from a police database, the photograph did not suggest to Aldrich that the person depicted was more likely to be the culprit.  [*Id.* at 19 (quoting *Jarrett v. Headley*, 802 F.2d 34, 41 (2d. Cir. 1986))].  As to McIntosh's argument that Hemphill could have photographed him, the Government responds that such a photo would have been even more suggestive than a random book-in photo, particularly since the book-in photo reflected different facial hair and did not show his teeth.  [*Id.* at 19-20].

The Government also contends that Aldrich's identification was reliable even if the process possibly was unnecessarily suggestive.  It argues that Aldrich had ample opportunity to view McIntosh, had an unobstructed view of him that was better than that captured by the video recording, and the seller was very close to her during the transaction.  [*Id.* at 39].  It also argues that the mere fact that the two interactions were

16

of short duration does not make Aldrich's identification unreliable. [*Id.* (citations omitted)].

The Government also points out that Aldrich had almost ten years of experience in drug investigations and in fact had conducted twenty transactions in this investigation. She was determined to buy heroin and identify the seller and recognized that she likely would be called upon to make an identification in court in the future, so she was not a casual or passing observer but rather a " 'trained officer on duty, who could be expected to pay scrupulous attention to detail.' " [*Id.* at 22 (quoting *Brathwaite*, 422 U.S. at 115)].

Next, the Government contends that the undercover agents gave a very detailed description of the seller such that Hemphill could immediately identify him minutes later, and Aldrich later recorded the seller's height, weight, and approximate age. [*Id.* at 22]. It argues that McIntosh does not contend that he does not match these descriptions but rather argues that Aldrich should have described even more characteristics, and it points out that identifications based on far fewer characteristics have been found reliable. [*Id.* at 22-23 (citations omitted)]. It also argues that Aldrich's unhesitating identification of McIntosh's book-in photo and the fact that she has not wavered in her identification point towards a finding of reliability. [*Id.* at 23].

17

Finally, the Government argues that the identification was reliable because it occurred mere hours after the transaction, which was less than the interim period between the event and the identification that other courts have countenanced. [*Id.* at 23-24 (citations omitted)].

In his reply, McIntosh contends that the Government virtually conceded that the single-photo showup was unduly suggestive.  He argues that although a single photo showup is not always unduly suggestive, it was in this case because it was a book-in photo indicating a prior criminal record and akin to showing a suspect in handcuffs, particularly in light of Aldrich's description of generic clothing worn by a black male with a goatee, with no other facial description. [Doc. 40 at 1-2].  He further argues that all characteristics of an unduly suggestive showup were present here: a single photo, presented by an officer who was not disinterested in making an identification to an officer similarly motivated, by way of a police book-in photo that did not match any of the descriptions given by the witness other than the color of his skin.  [*Id.* at 2].  And, as to the Government's argument that Aldrich was an experienced officer trained in making identifications, McIntosh observes that she did not give descriptions beyond a black male wearing generic clothing.  [*Id.* at 3].

18

McIntosh also contends that contrary to the Government's argument that the manner of presentation was not suggestive because Hemphill merely identified someone wearing clothing that matched the agents' description, he submits that Hemphill did not state how McIntosh matched the agents' description. [*Id.*]. He also points out that Hemphill made no report memorializing which portions of the undercover agents' description McIntosh matched. [*Id.* at 3-4].

McIntosh also disputes the Government's arguments that Hemphill and Aldrich were disinterested observers to the identification of a suspect, arguing that the whole point of the investigation was to buy heroin and make an identification, and so there was pressure to identify a suspect. He argues that if there was no such pressure, Aldrich could have viewed numerous photos. [*Id.* at 4]. Also, McIntosh again argues that the use of the book-in photo was unduly suggestive. [*Id.* at 4-5].

He also challenges the Government's reliability arguments. He contends that the video demonstrates that Aldrich spent less than two minutes observing the suspect, and he again argues that her view was not that unobstructed because all that was visible was the suspect's torso. [*Id.* at 5]. He also contends that Aldrich focused on the seller's hands, and when she did focus on his facial features, she only noted that he was black, with a goatee and crooked teeth, and that if she had paid more attention she would have

19

given a more detailed description. [*Id.*]. He also asserts that when she did give a more detailed description, it did not match the information on McIntosh's driver's license, although he fails to detail how it did not match. [*Id.*].

He also argues that there is no indicia of reliability that the correct suspect was detained by Hemphill because of the delay in Hemphill's entry into the neighborhood. He contends that first, the information had to be relayed from the undercover agents, to Lt. Ricker, to the uniformed officers such as Hemphill, who then had to drive several blocks east and then several blocks south to the corner of Carmen Alexander and James P. Brawley. [*Id.* at 6 (citing Def. Ex. 3)]. He disputes that this could take only a few minutes, much less occur immediately after the heroin sale. [*Id.*]. He also argues that the area is heavily populated and there was plenty of time for other similarly dressed black males to appear at the corner. [*Id.*]. In addition, McIntosh points out that there was a delay in Aldrich viewing the book-in photo because she had several encounters with others that day in the investigation and went to lunch and then to APD headquarters before she looked at a single photo. [*Id.* at 6-7]. He also claims that the identification was unreliable because Aldrich had contact with several other unknown individuals that day. [*Id.* at 7].

20

McIntosh also contends that the fact that Aldrich identified him in the courtroom and states that she is certain in her identification is of no moment, given the general unreliability of eyewitness identification, such as those wrongly identified and later exonerated by DNA evidence, the Georgia Legislature's adoption of best standards at O.C.G.A. § 17-20-2,[8] and the Georgia Supreme Court's discussion of the "vagaries"

---

[8]     That code section, effective July 1, 2016, provides that

(a) Not later than July 1, 2016, any law enforcement agency that conducts live lineups, photo lineups, or showups shall adopt written policies for using such procedures for the purpose of determining whether a witness identifies someone as the perpetrator of an alleged crime.

(b) Live lineup, photo lineup, and showup policies shall include the following:

(1) With respect to a live lineup, having an individual who does not know the identity of the suspect conduct the live procedure;

(2) With respect to a photo lineup, having an individual:

(A) Who does not know the identity of the suspect conduct the photo lineup; or

(B) Who knows the identity of the suspect use a procedure in which photographs are placed in folders, randomly shuffled, and then presented to the witness so that the individual conducting such procedure cannot physically see which photograph is being viewed by the witness until

21

of eyewitness identification.  [*Id.* at 7-8 (citations omitted)].

Next, McIntosh argues that there were several hours between the sale and

the procedure is complete;

(3) Providing the witness with instruction that the perpetrator of the alleged crime may or may not be present in the live lineup or photo lineup;

(4) Composing a live lineup or photo lineup so that the fillers generally resemble the witness's description of the perpetrator of the alleged crime;

(5) Using a minimum of four fillers in a live lineup and a minimum of five fillers in a photo lineup; and

(6) Having the individual conducting a live lineup, photo lineup, or showup seek and document, at the time that an identification of an individual or photograph is made, and in the witness's own words without necessarily referencing a numeric or percentage standard, a clear statement from the witness as to the witness's confidence level that the individual or photograph identified is the individual or photograph of the individual who committed the alleged crime.

(c) All law enforcement agency written policies adopted pursuant to this Code section shall be subject to public disclosure and inspection notwithstanding any provision to the contrary in Article 4 of Chapter 18 of Title 50.

O.C.G.A. § 17-20-2 (eff. 07/01/2016).

22

Aldrich's identification, rendering her identification unreliable.  [*Id.* at 8-9].  Finally, McIntosh disputes the correctness of the Government's reliance on *Brathwaite*, arguing that the case shows that a single-photo showup is widely condemned in the absence of any emergency or exigent circumstances.   [*Id.* at 9 (citing *Brathwaite*, 432 U.S. at 102, 104)].

### *Discussion*

The Supreme Court established the due-process standard against which police identification procedures are to be measured in *Stovall v. Denno*, 388 U.S. 293 (1967). "To violate due process, an identification procedure used by the police must be unnecessarily suggestive and create a substantial risk of misidentification." *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987) (citing *Neil v. Biggers*, 409 U.S. 188 (1972)); *see also Perry v. New Hampshire*, --- U.S. ----, ----, 132 S. Ct. 716, 724 (2012) ("[F]irst, . . . due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.").

Although unnecessary suggestiveness requires consideration of the totality of the circumstances, *see Simmons v. United States*, 390 U.S. 377, 384 (1968), and the cases do not clearly delineate what is and what is not improper suggestiveness, the Supreme Court has held that an identification procedure is unduly suggestive when it is virtually

23

inevitable that the witness will select the individual whom the police have singled out. *Foster v. California*, 394 U.S. 440, 443 (1969).  For example, in *Foster*, the victim could not identify the defendant from a three-person line-up, where the defendant was much taller than the other two persons and was wearing a leather jacket similar to the one the victim described the robber as wearing.  The identification was still tentative after the police arranged a one-on-one showup between the defendant and the victim.  Finally, in a line-up at which the defendant was the only person from the first line-up, the victim made a positive identification.  On review, the Supreme Court held that "[i]n effect, the police repeatedly said to the witness, 'This is the man,' " and thus offended due process.  *Id.*  "Determining whether an identification is so unreliable as to violate due process requires [the court] to answer two questions:  (1) whether the original identification procedure was unduly suggestive; and if so, (2) whether the procedure, given the totality of the circumstances, created a substantial risk of misidentification at trial."  *Marsden v. Moore*, 847 F.2d 1536, 1545 (11ᵗʰ Cir. 1988); *see also United States v. Diaz*, 248 F.3d 1065, 1102 (11ᵗʰ Cir. 2001).  If the identification procedure is not unduly suggestive, "that ends the inquiry."  *Williams v. Weldon*, 826 F.2d 1018, 1021 (11ᵗʰ Cir. 1987).  As the Supreme Court reiterated in *Perry*, "The Court adopted a judicial screen for reliability as a course preferable to a *per se* rule requiring exclusion

24

of identification evidence whenever law enforcement officers employ an improper procedure.  The due process check for reliability . . . comes into play only after the defendant establishes improper police conduct."  132 S. Ct. at 726; *see United States v. Elliot*, 732 F.3d 1307, 1310 (11th Cir. 2013) (holding that "when no improper law enforcement activity is involved, exclusion of an eyewitness identification is unnecessary").

Following the decision in *Perry*, the District Court in *United States v. Henry*, 939 F. Supp. 2d 1279 (N.D. Ga. 2013) (Batten, J.), stated, "The defendant has the burden of showing that the eyewitness identification was derived through 'impermissibly suggestive' means[,]" and "[o]nly after the defendant meets this burden must the government show the identification was reliable independent of the suggestive procedure." *Id.* at 1292 (citations omitted); *see also United States v. Mustafa*, No. 1:11-cr-234-01-CAP/AJB, 2012 WL 1904595, at *5 (N.D. Ga. Apr. 12, 2012) (Baverman, M.J.) (same), *adopted at* 2012 WL 1903255 (N.D. Ga. May 25, 2012) (Pannell, J.).

If the procedure is unduly suggestive, the Court must determine whether "the identification was nonetheless reliable."  *Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988). "This second stage involves consideration of five factors identified by the Supreme Court in *Neil v. Biggers*:  opportunity to view, degree of attention,

accuracy of the description, level of certainty, and length of time between the crime and the identification." *Id.* (citing *Biggers*, 409 U.S. at 199). "Under this analysis, 'reliability is the linchpin in determining the admissibility of identification testimony.' " *Williams*, 826 F.2d at 1021 (quoting *Brathwaite*, 432 U.S. at 114); *see also Perry*, 132 S. Ct. at 724-25 (same); *Hawkins v. Sec'y, Fla. Dep't of Corrs.*, 219 Fed. Appx. 904, 906 (11th Cir. Mar. 6, 2007) (" 'Where suggestive pretrial confrontations may have created a substantial likelihood of irreparable misidentification at trial, the core question is whether under the totality of the circumstances, the in-court identification was reliable.' ") (quoting *Jones v. Newsome*, 846 F.2d 62, 64 (11th Cir. 1988)).  In *Perry*, summarizing prior decisions, the Supreme Court stated, "Where the 'indicators of a [witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed. . . . Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." *Perry*, 132 S. Ct. at 725 (alteration in *Perry*, citation omitted); *see also United States v. Walls*, 237 Fed. Appx. 599, 602 (11th Cir. June 27, 2007) (Unless a court finds that there is a very substantial likelihood of irreparable misidentification, "arguments about the accuracy of the identification [go] to the weight of the testimony, not its admissibility.") (citing *Manson*,

AO 72A
(Rev.8/8
2)

432 U.S. at 116).  As the Supreme Court explained, "under our adversary system of justice, cross-examination has always been considered a most effective way to ascertain truth." *Watkins v. Sowders*, 449 U.S. 341, 349 (1981).

As noted, McIntosh bears the burden of proving that the identification procedure used was "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Simmons*, 390 U.S. at 384 (*cited in Biggers*, 409 U.S. at 198); *Albert v. Montgomery*,  732 F.2d 865, 871-2 (11th Cir. 1984).

Addressing Defendant's arguments in a logically chronological order, first, there was nothing constitutionally improper about Hemphill's approach and questioning of McIntosh.  Consistent with the Fourth Amendment, "[o]fficers are free, without any level of suspicion, to approach citizens on the street or in a public place and ask them questions [and] request proof of identification . . . ."  *Miller v. Harget*, 458 F.3d 1251, 1257 (11th Cir. 2006); *see also United States v. Drayton*, 536 U.S. 194, 201 (2002) (holding that even without a basis for suspecting criminal activity, officers may approach individuals to pose questions and ask for identification, provided the individual's cooperation is not induced by coercive means); *United States v. Felix*, No. 2:15-CR-102-FTM-38CM, 2015 WL 9029012, at *2 (M.D. Fla. Dec. 16, 2015) (holding that law enforcement officers do not violate the

Fourth Amendment's prohibition on unreasonable seizures each and every time they approach an individual on the street).  Thus, regardless of whether McIntosh was the only person matching the description given by the undercover agents or one of many, Hemphill was authorized to approach him on the street and ask for his identification as long as there was no coercion.

The record establishes no coercion here.  McIntosh asked why his identification was needed, Hemphill verbally responded because McIntosh was standing in the street, and McIntosh complied by giving Hemphill his identification.  There is no evidence that McIntosh's path was blocked or impeded, that the encounter was lengthy, that Hemphill touched McIntosh, or that Hemphill drew his weapon; only two officers were present; and in telling McIntosh why he wanted to see his identification, he did not use a tone that conveyed that the request could be compelled.  *See United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (setting out factors to consider in evaluating consensual nature of police-citizen encounter).

Turning to McIntosh's arguments about the photo showup, the Court is compelled to conclude that the identification procedure employed in this case was in fact unnecessarily suggestive.  It was unduly suggestive because Aldrich made her identification upon viewing a single photo, a procedure binding Eleventh Circuit

28

precedent has branded as unduly suggestive. *United States v. Cueto*, 611 F.2d 1056, 1063 (5th Cir. 1980) (procedure unduly suggestive where witness was shown one photograph of the defendant)[9]; *Hudson v. Blackburn*, 601 F.2d 785, 788 (5th Cir. 1979) (observing that "a single photograph display is one of the most suggestive methods of identification and is always to be viewed with suspicion")[10]; *see also Marsden*,

_____

[9]     Decisions of the Fifth Circuit rendered on or before September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[10]     The Court is not entirely unsympathetic with the Government's argument that the procedure employed was not unduly suggestive. If the Court applied the traditional test for evaluating suggestiveness of photographic array displays—the size of the array, the manner of its presentation by law enforcement officers, and the details of the photographs themselves, *United States v. Perkins*, 787 F.3d 1329, 1344 (11th Cir. 2015)—the Court likely would find it not unnecessarily suggestive. Aside from the single photograph and the fact that the photograph was a book-in photograph, the other factors in this analysis point to a finding of no undue suggestiveness. First, the manner of presentation was not suggestive. Hemphill's identification of McIntosh went solely to a person who matched the seller's appearance as described by the undercover agents. T1:50-51 (Hemphill testifying that he was looking for a black male, with a goatee, sunglasses, navy sweatshirt, dark jeans and black boots around the Cameron Alexander/James P. Brawley intersection, and he saw McIntosh at the location upon the uniformed officers' arrival). There is no indication that Aldrich directly spoke with Hemphill before she identified McIntosh through his book-in photo. Hemphill did not know if McIntosh was the person who sold heroin to Aldrich; all he knew was that, in his view, McIntosh matched the description the undercover agents had radioed a short time earlier. Moreover, Hemphill was not involved in the selection of the photograph that Aldrich viewed. Either Andresen or Aldrich herself pulled the photograph up in the APD database based on the name and date of birth provided by Hemphill/Lt. Ricker. In short, there was no undue pressure placed upon Aldrich by any

847 F.2d at 1545-46 ("There is no question that the pretrial photographic identification procedure, in which Marsden was the only male in the photographs shown to Gregory, was unduly suggestive.") (citations omitted).  These cases undercut the Government's argument that undue suggestiveness of single-suspect identifications is limited to in-person showups.[11]  In short, the procedure utilized was suggestive because there was a linear progression from Aldrich/Andresen's description to Aldrich's identification through a single photograph:  Hemphill identified McIntosh based on the undercover agents' description; Aldrich was advised that McIntosh was the person who matched their description; and Aldrich identified McIntosh as the heroin seller by looking at only one photograph, which happened to be of McIntosh.

At the same time, the Court rejects McIntosh's argument that the single-photo

_____

person to get her to identify McIntosh as the heroin seller.  Further, that the photograph used to make the identification did not show McIntosh wearing any of the clothing or sporting the type of facial hair or sunglasses that Aldrich observed during the heroin sale also shows that the presentation was not suggestive.  Still, because binding precedent concludes that a single-photo showup is improperly suggestive, the Court assumes that the procedure here was unduly suggestive and turns to the questions of necessity and reliability.

[11]     The Fifth Circuit has recognized that identifications in which a witness is shown only one person may not be unduly suggestive if the suspect is already known to the witness identifying him.  *United States v. Hefferon*, 314 F.3d 211, 218-19 (5th Cir. 2002).  That is not the case here.

showup was improper because his book-in photo was used.  There was nothing about that photo that pointed to McIntosh as a likely heroin seller or gave any indication whatsoever of his prior criminal record.  The photograph merely identified him as having previously been booked in at "Police Central."  Govt. Ex. 2.  Nor is there any indication that the APD database accessed by Andresen and Aldrich contained any photographs other than book-in photographs; for example, it appears that a GBI analyst had to pull McIntosh's driver's license information three days later from a different database.  Govt. Ex. 3.

The Court also concludes that the use of the single-photograph procedure in this case was indeed unnecessary.  Several facts support this finding.  First, Hemphill already had obtained McIntosh's name and date of birth, allowing Andresen and Aldrich to locate McIntosh's photograph in the APD database.  Second, Aldrich obtained a telephone number from "Moses," which was another potential avenue of identification.[12]  Third, the single-photograph protocol was unnecessary because, while Hemphill noted that there were other people in the area where he saw McIntosh, none fit the physical or clothing description given by Aldrich and Andresen.  T1:60.  This

---

[12]   The Court recognizes that there was a possibility that the phone number was not correct or not in McIntosh's name.  However, there was no evidence introduced that the agents utilized the phone number as a mechanism to identify the seller.

AO 72A
(Rev.8/8
2)

testimony is somewhat supported by Lt. Ricker's notes of the March 27, 2015, heroin sales to both these and other undercover officers, because these notes show that no other persons who approached undercover agents that day matched McIntosh's clothing description. *See* Def. Ex. 2 at 1 (recording various descriptions radioed by undercover agents: Yankees or Braves caps; green beanie hat; green leather jacket with characters on back; black jacket with designs; dreadlocks; beard with baseball hat; dark pants); *id.* at 2 (describing suspects as wearing grey puffy jacket; Flyers jacket; dark brown jacket with fur hood; shorter dreadlocks; tattoo with letter "L" on left side of neck; dark gray pants). Fourth, Hemphill's relatively quick identification of a suspect matching the undercover agents' description distinguishes this case from those single-person or -photo showups where speed to apprehend a suspect was critical. *See, e.g., Brisco v. Ercole*, 565 F.3d 80, 88-89 (2d Cir. 2009) (recognizing that although a one-person show-up is inherently suggestive procedure, it may not be impermissibly so in certain circumstances, such as when a sole eyewitness is at risk of dying or when an officer has detained a suspect at the scene and does not want to mistakenly arrest an innocent person); *United States ex rel. Cummings v. Zelker*, 454 F.2d 714, 716 (2d Cir. 1972) (approving showup on grounds of exigency, reasoning that if the police did have the wrong man, the procedure permitted them to "resume the search for the fleeing culprit

32

while the trail [wa]s still fresh.") (quoting *Bates v. United States*, 405 F.2d 1104, 1106 (D.C. Cir. 1968)).  The task force was not going to conduct arrests of the heroin sellers on the day of the purchase so as to not compromise the ongoing investigation,[13] and since the investigation was ongoing, and Aldrich and Andresen had completed their two sales of the day, there was no reason advanced by the Government why Aldrich could not have been presented with a multiple-photo array in order to attempt to make a less-suggestive identification of the seller.

Nonetheless, suppression is not warranted because, despite the unnecessarily suggestive procedure employed, the identification was reliable.  The cases demonstrate that even a single-picture photo display can be admissible if the identification is otherwise reliable.  *Manson*, 432 U.S. at 114-16; *United States v. Cannington*, 729 F.2d 702, 711 (11th Cir. 1984) ("An in-court identification, even if preceded by a suggestive out-of-court identification procedure, is nevertheless admissible if the in-court identification has an independent source.  . . .  Among the indicia of a

---

[13]     The Court rejects the Government's somewhat-related argument that the possibility that a particular seller would not be prosecuted somehow militated against suggestiveness or necessity.  The entire goal of the investigation was to buy heroin and identify suspects.  That at some later point prosecutors decided not to prosecute some of the sellers is irrelevant to the investigation into which persons were selling heroin in the English Avenue neighborhood.

33

sufficient, independent basis for identification are the witness's opportunity to observe the defendant at the time of the offense, the witness's degree of attention, the degree of certainty shown at the confrontation, and the length of time between the crime and the confrontation.") (citations omitted).  For an identification to be unconstitutionally unreliable, there must be a substantial risk of misidentification.  *Walls*, 237 Fed. Appx. at 601 (citing *Johnson*, 817 F.2d at 729).

In this case, application of four of the five *Biggers* reliability factors weigh in favor of finding that the out-of-court identification was reliable notwithstanding the undue suggestiveness of the single-photo showup.  *See Manson*, 432 U.S. at 114; *Biggers*, 409 U.S. at 199-200; *Diaz*, 248 F.3d at 1102.  Aldrich had two opportunities to view McIntosh, and although each viewing was of a relatively short duration, the viewings were unimpeded.  The Court rejects McIntosh's argument that Aldrich could not see his face.  While the video camera mounted on the inside of the driver's door was at an angle that only briefly captured the seller's face, Aldrich's vantage point seated in the passenger seat was much better as she could see outside the vehicle and look up at the seller, unlike the video camera.  In the initial encounter, Aldrich was less than three feet from McIntosh and, in the second, during the actual drug exchange, they were so close that their hands touched.  Thus, there were no obstructions to her view.

34

Further, due to the nature of the encounters, Aldrich paid close attention to McIntosh since she knew she would have to make a later identification.  In this regard, like the undercover officer in *Manson*, Aldrich was an experienced law-enforcement officer who was cognizant of needing to identify the seller in a future judicial proceeding.  *See Manson*, 432 U.S. at 114-17 (holding that, although single-photo identification procedure was suggestive, the totality of the circumstances did not show a substantial likelihood of irreparable misidentification where the police officer who made the identification was trained, had a sufficient opportunity to view the suspect, accurately described him, positively identified his photograph, and made the photographic identification only two days after the crime); *United States v. Bissonette*, 164 F.3d 1143, 1146 (8th Cir. 1999) (not error to allow officer to identify defendant after identifying him in single-photo array:  officer, who had previously been trained as a police officer and specifically in identification procedures, was part of an undercover sting operation at time of  transaction and knew he needed to observe the seller carefully); *see also Meyer v. Estelle*, 621 F.2d 769, 775 (5th Cir. 1980) (observing that *Manson* "lends significance to [the agent's] training as a police officer").

Next, the one factor which does not support reliability is Aldrich/Andresen's description of the seller as compared to how McIntosh appeared in the book-in

AO 72A
(Rev.8/8
2)

photograph.   Although Aldrich testified that she was able to make an in-court identification of McIntosh because of the shape of his face, goatee, nose, and mouth, T1:21, no description of features other than the description at the scene that he had a goatee was in fact described in her testimony or in the evidence.   Thus, the Court is unable to conclude that the description given by the agents at the scene accurately compared to the image displayed in the book-in photo.   On the other hand, the Court concludes that the description broadcast to the other officers was detailed enough to allow Hemphill to locate McIntosh as someone who met that description.   T1:51 (Hemphill testifying that they were searching for a "black male, goatee, sunglasses, had on a navy sweatshirt, dark jeans, black boots" and when the officers arrived at the location, "we saw a suspect matching that description).

Further, Aldrich was very certain that the person depicted in the book-in photograph she viewed was the person from whom she bought heroin earlier that day. Finally, the time between the sale of the heroin and Aldrich's identification was less than four hours, which also points to the reliability of the identification.  *United States v. Funches*, 84 F.3d 249, 255 (7th Cir. 1996) (showup four hours after robbery reliable); *United States v. Thurston*, 771 F.2d 449, 453 (10th Cir. 1985) (identification was reliable where it occurred within four hours of the incident); *Faison v. Zahradnick*,

36

563 F.2d 1135, 1136-37 (4th Cir. 1977) (identification made four hours after robbery reliable).  Moreover, the Court observes that Hemphill's identification of McIntosh as the person who fit the undercover agents' description occurred only a few minutes after the officers received the signal to enter the neighborhood, since they were less than two blocks away from the intersection where they located him.

As a result, the Court concludes that the identification by Aldrich, although unnecessarily suggestive, was nonetheless reliable.  McIntosh makes a number of challenges to the reliability of the identification, such as to the adequacy and completeness of Aldrich's description, her alleged poor vantage point, and confusion over which photograph she viewed to make the identification, to identify a few, but these are proper subjects for cross-examination at trial and do not establish as a matter of law that due process was offended in the identification.  Further, while the Court appreciates the considered judgment of the Georgia appellate courts and the Georgia legislature on the subject of the vagaries of eyewitness identifications, this Court is bound by Supreme Court and Eleventh Circuit decisions and not those of the Georgia appellate courts or the Georgia legislature on issues of the constitutionality of the identification procedures and the admission of   evidence.  *Key v. Wise*, 629 F.2d 1049, 1058 (5th Cir. 1980) ("[F]ederal courts are not bound by state court decisions on matters of federal law.").  Said another way, federal law governs federal

37

prosecutions in federal court.  *Elkins v. United States*, 364 U.S. 206, 223 (1960); *see also United States v. Bailey*, 123 F.3d 1381, 1395 n.20 (11th Cir. 1997) ("[F]ederal law governs the admissibility of evidence in a federal prosecution, even if the evidence is obtained in violation of state law[.]") (citing *United States v. Malekzadeh*, 855 F.2d 1492, 1496 (11th Cir. 1988)); *United States v. Little*, 753 F.2d 1420, 1434 (9th Cir. 1984) ("Evidence obtained in violation of neither the Constitution nor federal law is admissible in federal court proceedings without regard to state law.").  Thus, McIntosh's reliance on state law is misplaced in the context of seeking to suppress the identification testimony in this case.

### Conclusion

For all of the above and foregoing reasons, the Court **RECOMMENDS** that McIntosh's motion to suppress identification, [Doc. 24], be **DENIED**.  Having ruled on all matters referred to it, and not being advised of any impediment to the scheduling of trial, the Court **CERTIFIES** this case **READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the  27th  day of April, 2016.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)