IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.                                                        1:15-cr-194-WSD

JASPER MCINTOSH,

                                    Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant Jasper McIntosh's

("Defendant" or "McIntosh") Objections [45] to Magistrate Judge Alan J.

Baverman's Report and Recommendation [43] ("R&R").  The Magistrate Judge

recommends that Defendant's Motion to Suppress Out-of-Court Identification [24]

("Motion to Suppress"), as supplemented [27], be denied.

## I.      BACKGROUND

Defendant is charged in a single-count indictment with distribution of

heroin.  (Indictment [1]).  The charge arises from the "Drug Marketing Initiative"

("DMI"), an operation in which undercover law enforcement officers attempt to

purchase heroin from individuals in the English Avenue neighborhood of Atlanta.

Generally, the undercover officers broadcast over a police radio a description of

the individual who sold them heroin, and once the undercover officers leave the

area, uniformed officers enter it and try to locate the seller based on the description broadcast to them by the undercover officers.  If they find a person matching the description of the seller, the uniformed officers ask the suspected seller for identification, record the information, and report it back to the supervising officer. The supervising officer gives that information to the undercover officers, who try to determine, from a driver's license or book-in photo of the individual identified by the uniformed officers, whether he is the individual who sold them heroin earlier that day.

     As part of the DMI operation, on March 27, 2015, at approximately 11:00 a.m., Georgia Bureau of Investigation ("GBI") Special Agent Kelly Aldrich ("SA Aldrich") and her partner, Task Force Agent Andresen ("TFA Andresen"), both dressed in plain clothes, attempted to buy narcotics in the English Avenue neighborhood.  (Tr. of Dec. 18, 2015, Hr'g [34] ("Tr.1") at 7, 39).  TFA Andresen was driving an undercover vehicle, and SA Aldrich was in the front passenger seat. (Id. at 10-11 & Gov't Ex. 1).  Cameras were located inside their vehicle on the driver's and passenger's side doors.  (Id.).  The agents drove through the English Avenue neighborhood with the windows rolled down and waited to be approached by persons offering to sell them heroin.  (Id. at 7, 11).  Near the intersection of Cameron Alexander Boulevard and James P. Brawley Drive, SA Aldrich and

TFA Andresen were flagged down by a black male, who approached the passenger side of the vehicle and asked, "Hey, what's up?"  (Id. at 11-13).  SA Aldrich asked for fifty dollars' worth of "boy," a slang term for heroin, and the male told them to drive around the block and come back.  (Id. at 13).  The male was standing on the sidewalk, about three (3) feet from the passenger window of the vehicle.  (Id.).  He was wearing a hoodie and sunglasses.  (Id. at 14).

While they were circling the block, SA Aldrich and TFA Andresen broadcast the following description of the seller to nearby Atlanta Police Department ("APD") officers who were listening over the police radio: black male, blue hooded sweatshirt, black T-shirt underneath, sunglasses, goatee, crooked teeth, and dark-colored jeans, headed north on James P. Brawley.  (Id. at 15-18, 39, 42; Tr. of Jan. 14, 2016, Hr'g [36] ("Tr.2") 2 at 14, 23).  SA Aldrich and TFA Andresen returned to the intersection and recognized the same man, again walking toward them.  (Tr.1 at 16-17).  TFA Andresen reported over the radio that his pants were rolled up at the bottom and he was wearing black boots.  (Id. at 14).

The man approached the passenger window of the agents' vehicle, reached in, and handed SA Aldrich a plastic bag containing suspected heroin.  SA Aldrich paid him $50.  (Id. at 18).  SA Aldrich testified that, during the transaction, the man was "not even a foot" away from her, that she had a clear view of the seller,

and that, although he wore a hoodie and sunglasses, she had a clear view of his face and there was nothing that impaired or impacted her view of him.  (Id. at 18-19).  When he first put his hands in the window of the vehicle, SA Aldrich was "looking at his hands," but "once [she was] handing him the money and talking to him, [she was] looking at his face" because her "main goal is to try to get a description of him."  (Id. at 19).  SA Aldrich asked the seller for his telephone number, which he gave her, and she wrote it on her hand.  (Id.).  As she was writing, SA Aldrich paid attention to the seller's face by looking back and forth between her hand and his face.  (Id. at 20).

After the purchase, SA Aldrich and TFA Andresen drove to another part of the English Avenue neighborhood and purchased heroin from another person, ten to fifteen minutes after the first purchase.  (Id. at 22).  After the second purchase, the agents met at a nearby staging area and debriefed with GBI Lieutenant William Ricker ("Lt. Ricker"), who was supervising the DMI operation.  (Id. at 23).

At some point shortly after SA Aldrich and TFA Andresen left the English Avenue neighborhood, APD Officers Hemphill and Gibson, who had listened to SA Aldrich and TFA Andresen's description of the seller over the police radio, entered the neighborhood to locate the seller.  (Tr.1 at 50; Tr.2 at 10). Officer Hemphill approached the intersection of Cameron Alexander and James P.

Brawley and looked for a "black male, goatee, sunglasses, [who] had on a navy sweatshirt, dark jeans, [and] black boots."  (Tr.1 at 51).  Officer Hemphill approached a man matching that description who was standing in the street and who said he was waiting for a ride.  (Id.).  Officer Hemphill asked to see his identification, and the man complied.  (Id.).  The name on the identification was Jasper McIntosh, and his date of birth was August 12, 1985.  (Tr.2 at 10 & Def's Ex. 2).  Officer Hemphill went to his police car, entered the information into his computer, and checked whether Defendant had any outstanding warrants for his arrest, which he did not.  (Tr.1 at 51-52).  Officer Hemphill returned Defendant's license and Defendant left in a vehicle.  (Id. at 52).  Officer Hemphill returned to the briefing area and gave Defendant's identifying information to Lt. Ricker. (Id. at 52-53; Tr.2 at 10).

Lt. Ricker gave Defendant's name and date of birth to SA Aldrich and TFA Andresen, and after lunch, SA Aldrich and TFA Andresen went to APD headquarters.  (Tr.1 at 24, 26-27).  About 3:00 p.m., SA Aldrich and TFA Andresen searched an APD database using the name and date of birth obtained by Officer Hemphill, and found a book-in photo of Defendant.  (Id. at 37, 43).  SA Aldrich recognized Defendant as the person from whom she had bought heroin earlier that day.  (Id. & Gov't Ex. 2).

On May 27, 2015, a federal grand jury returned a one-count indictment charging Defendant with aiding and abetting the distribution of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.  (Indictment [1]).

On August 26, 2015, Defendant moved to suppress SA Aldrich's out-of-court identification.  (Mot. to Suppress [24]).

On December 18, 2015 and January 14, 2016, Magistrate Judge Baverman conducted an evidentiary hearing on Defendant's Motion to Suppress.  At the evidentiary hearing, the Government presented the video recording of the transaction, although the seller's face is only briefly seen on the video during the second interaction and is difficult to make out.  (Gov't Ex. 1 at 11:20-11:15). SA Aldrich testified that, based on her training and experience, during undercover operations like DMI, she "always look[s] at hands first because . . . if we are going to get hurt, that is the thing that will hurt us.  . . . Secondarily, look at their face, stature for identification purposes later, especially in cases such as these we know they are not going to be arrested immediately after the buy that we know we are going to have to identify them later." (Tr.1 at 8).  SA Aldrich focuses on "size, stature, more important facial features down to hair, eyes, nose, mouth, cheek bones, [and] the shape of their face." (Id.).  SA Aldrich identified Defendant in the courtroom as the seller, even though at the evidentiary hearing Defendant was in a

wheelchair, and was not wearing a hoodie or sunglasses.  (Id. at 21).  SA Aldrich testified that she recognized Defendant "[m]ostly just through the shape of his face, goatee, nose, mouth."  (Id.).

On April 27, 2016, Magistrate Judge Baverman issued his R&R, recommending that Defendant's Motion to Suppress be denied.

On April 29, 2016, Defendant timely filed his Objections to the R&R.

## II.    STANDARD OF REVIEW

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; Williams v. Wainwright, 681 F.2d 732 (11th Cir. 1982), cert. denied, 459 U.S. 1112 (1983).  A district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party."  Jeffrey S. v. State Bd. of Educ. of Ga., 896 F.2d 507, 512 (11th Cir. 1990) (internal citations omitted).  With respect to those findings and recommendations to which objections have not been asserted, the Court must

conduct a plain error review of the record.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983), cert. denied, 464 U.S. 1050 (1984).

## III.   DISCUSSION

On a motion to suppress an out-of-court identification, a district court applies a two-step analysis: "First, we must determine whether law enforcement used an identification procedure that is both suggestive and unnecessary." United States v. Whitehead, 567 F. App'x 758, 768 (11th Cir. 2014) (citing United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001) & Perry v. New Hampshire, 565 U.S. ---, ---, 132 S.Ct. 716, 724 (2012)).  If the court concludes that the identification procedure was suggestive and unnecessary, the court "must then consider whether, under the totality of the circumstances, the identification was nonetheless reliable."  Id. (quoting Diaz, 248 F.3d at 1102).

Here, the Magistrate Judge concluded that the identification procedure used in this case was unnecessarily suggestive because SA Aldrich made her identification upon viewing a single photo, and there was no reason why SA Aldrich could not have been shown a multiple-photo array to make a less suggestive identification of the seller.  (R&R at 28-33).  The parties did not object to the Magistrate Judge's conclusion that the identification procedure used in this case was unnecessarily suggestive, and the Court finds no plain error in these

findings and conclusion.  See United States v. Cueto, 611 F.2d 1056, 1063

(5th Cir. 1980) (procedure unduly suggestive where witness was shown one

photograph of defendant); Hudson v. Blackburn, 601 F.2d 785, 788 (5th Cir. 1979)

(observing that "a single photograph display is one of the most suggestive methods

of identification and is always to be viewed with suspicion");[1] see also

Marsden v. Moore, 847 F.2d 1536, 1545-46 (11th Cir. 1988) ("There is no

question that the pretrial photographic identification procedure, in which Marsden

was the only male in the photographs shown to Gregory, was unduly suggestive.").

Defendant objects to the Magistrate Judge's conclusion that, even though the

procedure was unnecessarily suggestive, the identification is not required to be

suppressed because it is reliable.  The Magistrate Judge found that, although he

could not conclude that SA Aldrich's description of the seller at the scene

accurately compared to the image displayed in the book-in photo, SA Aldrich's

description broadcast to the other officers was detailed enough to allow Officer

Hemphill to locate McIntosh as the suspected seller.  (R&R at 35-36).  The

Magistrate Judge found further that the identification was reliable because

SA Aldrich had two opportunities to view the seller; her view was unobstructed;

---

[1]     In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the
Eleventh Circuit adopted as binding precedent all of the decisions of the former
Fifth Circuit handed down prior to the close of business on September 30, 1981.

due to the nature of the encounter and her training and experience, SA Aldrich paid

close attention to McIntosh so she could identify him later; the identification was

made less than four hours after the sale; and SA Aldrich was "very certain" that

McIntosh was the person who sold her heroin.  (R&R at 34-38).

"Factors to be considered in determining whether the identification was

reliable include: (1) opportunity to view; (2) degree of attention; (3) accuracy of

the description; (4) level of certainty; and (5) length of time between the crime and

the identification."  Whitehead, 567 F. App'x at 768 (quoting Diaz, 248 F.3d at

1102); see also Neil v. Biggers, 409 U.S. 188, 199-200 (1972).  "Where the

'indicators of [a witness'] ability to make an accurate identification' are

'outweighed by the corrupting effect' of law enforcement suggestion, the

identification should be suppressed."  Perry, 132 S.Ct. at 725.  "Otherwise, the

evidence (if admissible in all other respects) should be submitted to the jury."  Id.

See also Biggers, 409 U.S. at 199-200 (use of an unnecessarily suggestive showup

did not require suppression of victim's identification of assailant);

Manson v. Brathwaite, 432 U.S. 98, 114-117 (1977) (use of unnecessarily

suggestive photo array did not require exclusion of resulting identification).

In his Objections, Defendant argues that there is no evidence to support the

Magistrate Judge's findings that SA Aldrich's view was unimpeded, that the

seller's face could be seen, and that SA Aldrich paid close attention to the seller. Defendant argues that SA Aldrich did not pay close attention to the seller because, "if she had, she would have made a detailed description of the suspect." (Id.).  The Court disagrees.

SA Aldrich testified that she had a clear, unobstructed view of the seller during both interactions, and that during the actual sale, they were so close that their hands touched.  (Tr.1 at 18-19).  SA Aldrich stated that, based on her training and experience conducting during undercover operations like DMI, she "look[s] at their face, stature for identification purposes later, especially in cases such as these we know they are not going to be arrested immediately after the buy that we know we are going to have to identify them later." (Id. at 8).  To help identify the seller later, SA Aldrich focuses on "size, stature, more important facial features down to hair, eyes, nose, mouth, cheek bones, [and] the shape of their face." (Id.). SA Aldrich identified Defendant at the evidentiary hearing because she recognized Defendant "[m]ostly just through the shape of his face, goatee, nose, mouth." (Id. at 21).  To the extent Defendant contends that SA Aldrich's testimony is undercut by "her utter lack of detailed description of the person's characteristics other than a generic clothing description" (Objs. at 2), Defendant's argument is mere speculation and is not sufficient to require that the identification be suppressed.

Put another way, that SA Aldrich did not describe the seller's face out loud at the time of the transaction does not necessarily mean that she could not see his face or that she did not pay attention. Having conducted its *de novo* review, the Court overrules Defendant's objection on this ground.

Defendant next argues that the Magistrate Judge should not have considered that SA Aldrich stated she was certain in her identification of Defendant as the seller. (Objs. at 2). It is well-settled that one of the factors to be considered in determining whether an identification is reliable includes the witness's "level of certainty" in making the identification. See, e.g., Biggers, 409 U.S. at 199-200; Diaz, 248 F.3d at 1102; Whitehead, 567 F. App'x at 768. To the extent Defendant relies on the Supreme Court of Georgia's decision in Brodes v. State, 614 S.E.2d 766 (Ga. 2005), to support that "'certainty' is of no value in judging the reliability of an identification" (Objs. at 3), in a federal criminal prosecution, the admissibility of evidence is governed by federal law, and federal courts are not bound by state court decisions. See Key v. Wise, 629 F.2d 1049, 1058 (5th Cir. 1980); United States v. Bailey, 123 F.3d 1381, 1395 n.20 (11th Cir. 1997). Brodes simply does not apply.

Even if state law was relevant in this federal prosecution, in Brodes, the Georgia Supreme Court held that a witness's "level of certainty" was not a

permissible factor for the *jury* to consider in evaluating reliability of a witness's identification.  Brodes, 614 S.E.2d 766.  In discussing the origin of the "level of certainty" factor in the Georgia pattern jury instruction, the court in Brodes noted: "Our pattern charge takes three of the criteria *used by a trial judge to determine the admissibility of evidence,* including the 'level of certainty' factor, [as listed in Biggers,] *and passes them on to the jury* to be used to assess the reliability of an eyewitness identification."  Id. at 770 (emphasis added).  In view of the "scientifically-documented lack of correlation" between a witness's certainty in an identification and its accuracy, and the "critical importance of accurate jury instructions to guide they jury[]," the Brodes court "advise[d] trial courts to refrain from informing jurors they may consider a witness's level of certainty when instructing them on the factors that may be considered in deciding the reliability of that identification."  Id. at 771.[2]  Brodes does not, as Defendant suggests, support

---

[2]     Unlike the Georgia pattern jury instruction at issue in Brodes, the Eleventh Circuit Pattern Jury Instruction for Identification Testimony does not include a witness's "level of certainty" as a factor the jury should consider when evaluating the witness's identification.  The Eleventh Circuit Pattern Jury Instruction provides, in part:

> [E]ven if you believe the witness is telling the truth, you must still decide how accurate the identification is.  I suggest that you ask yourself questions:
>> 1.  Did the witness have an adequate opportunity to observe the person at the time the crime was committed?
>> 2.  How much time did the witness have to observe the person?

that a trial court should not consider the witness's stated certainty in evaluating

whether evidence should be admitted at trial.  Having conducted its *de novo*

review, the Court overrules Defendant's objection on this ground.

Finally, Defendant argues that "[t]he fact the description of the suspect does

not match the description of the book in photo trumps the other factors."  (Objs. at

3).  Although the description SA Aldrich gave over the radio at the time of the

transaction focused on the seller's clothing and, therefore, does not match the

image of Defendant in the book-in photo, the Court notes that SA Aldrich's

description was detailed enough to allow Officer Hemphill to locate Defendant, in

the same area that the transaction occurred just minutes earlier, as someone who

met the description of the suspected seller.[3]  There is simply no basis in law or fact

to support Defendant's assertions that the description of the seller compared to the

---

3. How close was the witness?
4. Did anything affect the witness's ability to see?
5. Did the witness know or see the person at an earlier time?
You may also consider the circumstances of the identification of the Defendant, such as the way the Defendant was presented to the witness for identification and the length of time between the crime and the identification of the Defendant.

Special Instruction 3, Identification Testimony, Eleventh Circuit Pattern Jury Instructions, Criminal Cases (2010).

[3]     When Officer Hemphill arrived, although there were other individuals in the area, Defendant was "the only person at that corner" where the transaction occurred, and Defendant was the only person who fit the description given by SA Aldrich.  (Tr.1 at 60).

Defendant's appearance in the book in photo "is the most important factor of all" and "[i]t could have been any photo of a black male at any age since [SA] Aldrich did not give any specific characteristics."  (Objs. at 3-4).  Having conducted its *de novo* review, the Court overrules Defendant's objection on this ground.

The Court finds that, although the process used in SA Aldrich's identification of Defendant was unnecessarily suggestive, under the totality of the circumstances, the identification was nonetheless reliable.  See Biggers, 409 U.S. at 199; Whitehead, 567 F. App'x at 768; Diaz, 248 F.3d at 1102.  To the extent Defendant challenges the reliability of SA Aldrich's identification, including based on her alleged poor vantage point, the adequacy of her description, the length of time between the transaction and the identification, and the claimed unreliability of eyewitness identification, these may be proper subjects for cross-examination at trial.  They do not, however, require that SA Aldrich's identification be excluded from trial.  See Perry, 132 S.Ct. at 725 ("Where the indicators of [a witness'] ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed.  Otherwise, the evidence . . . should be submitted to the jury.") (internal quotation marks and citations omitted); United States v. Walls, 237 F. App'x 599, 602 (11th Cir. 2007) (Unless a court finds there is a very

substantial likelihood of irreparable misidentification, "arguments about the accuracy of the identification [go] to the weight of the testimony, not its admissibility."); Watkins v. Sowders, 499 U.S. 341, 349 (1981) ("[U]nder our adversary system of justice, cross-examination has always been considered a most effective way to ascertain truth.").  Defendant's Motion to Suppress is denied.

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Objections [45] to the R&R are **OVERRULED**.

**IT IS FURTHER ORDERED** that Magistrate Judge Alan J. Baverman's Report and Recommendation [43] is **ADOPTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Out-of-Court Identification [24], as supplemented [27], is **DENIED**.

**SO ORDERED** this 24th day of May, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

16